DIXON, Judge.
Mrs. Glenda Marie O’Neal and her husband, Benny Floyd O’Neal, and Mrs. Wanda Fay Mason and her husband, Bobby Gene Mason, seek damages as the result of an automobile accident that occurred on January 4, 1967 south of Cotton Valley, Louisiana, in Webster Parish on Louisiana Highway 7. Mrs. O’Neal was driving Mrs. Mason in a southerly direction in the O’Neals’ Mustang when they met a truck owned by the defendants Harold Nations and J. R. Nations and driven by Thomas Vaughan. As the O’Neal car approached the truck, a sack of cottonseed hulls fell from the flatbed truck and skidded down the highway into the path of the Mustang. When Mrs. O’Neal maneuvered to miss the hulls and had almost brought her car to a stop, it was struck in the rear by a red Pontiac driven by Miss Lillie Nell Ed-monds, owned by Mrs. Mavonie Edmonds, and insured by defendant, State Farm Mutual Automobile Insurance Company. Miss Mildred Lee was a passenger in the Ed-monds Pontiac. The plaintiffs claim damages from the defendants already mentioned and also from Anderson, Clayton & Company and its insurer, Export Insurance Company. The basis of this claim was the fact that Anderson, Clayton & Company had sold the feed to Nations Brothers and had loaded the truck, and the contention that there was a duty on the seller of the feed to see that it was properly secured on the customer’s vehicle.
The trial court cast Harold Nations, J. R. Nations and Thomas Vaughan, (the owners and the driver of the truck) and Nations Brothers Cattle Company, a partnership composed of J. R. Nations and Harold Nations, and rejected the demands of the plaintiffs against Mrs. Edmonds, *598 Miss Edmonds, State Farm Mutual Automobile Insurance Company, Anderson, Clayton & Company and Export Insurance Company, as well as third party demands made against State Farm Mutual, Mrs. Ed-monds and Miss Edmonds. Glenda Marie O’Neal was awarded $3000.00; Benny Floyd O’Neal was awarded $1300.20; Wanda Mason was awarded $3750.00 and Bobby Gene Mason was awarded $1823.15.
The only parties who perfected an appeal were the plaintiffs; no others either appealed or answered the appeal. The plaintiffs seek on appeal to increase the awards and to establish the liability of the other defendants.
The evidence shows that, on the morning of the accident, Thomas Vaughan drove a flatbed/ truck owned by Nations Brothers into a cotton oil mill owned by Anderson, Clayton & Company, and referred to throughout the record as “Paymaster.” Vaughan stopped at an office, arranged for the purchase of certain sacks of cottonseed meal and cottonseed hulls for the Nations Brothers. He then proceeded to a loading dock where four Negro employees loaded eighty sacks of cottonseed hulls and sixty sacks of cottonseed meal on the flatbed truck. The cottonseed meal was in 100 lb. burlap bags. The cottonseed hulls were in 50 lb. paper bags. After his truck was loaded, Vaughan proceeded to tie the sacks down. He used rope which he obtained from the cab of his truck, which was described as ty,grass rope and nylon rope that Vaughan referred to as being “lariat rope” and described as being a little better than a \/¿' in diameter. Because the paper sacks of hulls were known to slip, both of these ropes were used to tie the cottonseed hulls. The heavier burlap sacks of cottonseed meal were tied with material referred to as “grass string,” which Vaughan said the Negro employees of the cottonseed mill obtained for him.
Vaughan’s description of the tieing of the load left something to be desired as to clarity; in general, he stated that he looped the ropes on one side in the iron receptacles for stakes on the bed of the truck, then threw the ropes over the load where one of the Negro employees looped the rope on that side of the truck. Just who tied what knots is not clear from Vaughan’s testimony. Vaughan testified that after the ropes were tied, he mounted to the top of the load from which point he tightened the ropes.
There is no evidence that the feed was improperly loaded by the employees of the cotton oil mill. The supervisors of the mill testified that they had instructed their employees not to assist in tieing customers’ loads. Sales or feed by the mill were made f. o. b. the customer’s truck. The mill loaded, but did not tie down, according to both the supervisory employees and the laborers who loaded the truck. There is not sufficient evidence in the record to find that employees of the cotton oil mill actually undertook to tie Vaughan’s load. The evidence is convincing that, if any laborer employed by the cotton oil mill assisted Vaughan in tieing the load, it was at the specific request of Vaughan to catch a rope on the other side of the truck and to assist him. It cannot be said that employees of the cotton oil mill in any way voluntarily assumed the responsibility of tieing the load on Vaughan’s truck.
In brief, the plaintiffs assert that there is a duty on a merchant who undertakes to load a truck to see that the truck’s cargo is properly secured so that it will not endanger other vehicles on the highway. To support this contention plaintiffs cite Bardwell v. England Transportation Co., Inc., 169 So.2d 537 (La.App.1964) ; State Farm Mutual Automobile Insurance Co. v. Herrin Transportation Co., 136 So.2d 272 (La.App.1961) ; Prophet v. Great American Indemnity Co., 48 So.2d 674 (La.App.1950); Wilcox v. B. Olinde & Sons Co., 182 So. 149 (La.App.1938) and Pizzitola v. Letellier Transfer Co., 167 So. 158 (La.App.1936). None of these cases are apposite to the situation before us.
*599 In Bardwell v. England Transportation Co., the plaintiff was injured when the defendant’s employees unloading the truck lost control of a crate which fell on the plaintiff truck driver. In State Farm Mutual Automobile Insurance Co. v. Herrin Transportation Co., the plaintiff’s subrogor had recovered for damages caused by an object which fell from defendant’s truck. The defendant’s truck left the defendant’s place of business, and there was no question about a merchant’s duty to properly secure a customer's load. In Prophet v. Great American Indemnity Co., a passenger bus was damaged by gin poles on a truck; there was no indication in the opinion whether these gin poles were loaded by the truck owner or by someone else. In Wilcox v. B. Olinde & Sons Co., a keg of beer fell off a truck, but there was nothing in the opinion with reference to the duty of a merchant in loading a customer’s truck with kegs of beer. In Pizzitola v. Letellier Transfer Co., improperly loaded bales of paper fell off a truck; there was nothing in the opinion to indicate that this truck was loaded by any other than the owner of the dray at its own place of business.
In short, we can find no support for the plaintiffs’ theory either in the evidence adduced on the trial of this case, or in the jurisprudence.
It seems to be agreed among the parties that the rope binding the cottonseed hulls was so tight that at least one sack was cut, allowing hulls to escape, and perhaps allowing enough slack so that another sack of hulls could slip from the load. Pinpointing the dereliction which caused the accident, the plaintiffs contend that chaffing gear should have been used to prevent the ropes cutting the paper sacks. The sacks should have been secured so that motorists would not be in danger, and chaffing gear did seem to be appropriate. However, we find no duty on the cotton oil mill, who sells its products f. o. b. the customer’s truck, to prohibit the movement of the load until it is safely secured on the truck. The vendor’s control over the merchandise ended with the loading on the customer’s truck. We do not find that the cotton oil mill, through its employees, voluntarily undertook the securing of the load, or 'negligently performed any act in connection with the feed.
Plaintiffs further seek to establish responsibility for the accident on the driver of the Edmonds Pontiac automobile. The evidence in the record exonerates Miss Edmonds from liability. The red Pontiac occupied by Miss Edmonds and Miss Lee was following the Mustang in a southerly direction. Both automobiles were headed for the same destination, the Louisiana Ordnance Plant. Both automobiles were traveling at approximately sixty miles an hour. Miss Edmonds contemplated passing the Mustang. In plaintiffs’ view Miss Edmonds was “tailgating to tragedy.” The plaintiffs saw a sack of feed fall from Vaughan’s truck. It hit the highway and slid down the highway in plaintiffs’ lane of travel, propelled by the momentum of the truck from which it fell. The plaintiffs’ automobile ran over this sack before it stopped moving, and was, in turn struck by the Edmonds automobile before the Mustang had come to a complete stop. The plaintiffs’ Mustang left 162 feet of skid marks. The Edmonds Pontiac left 135 feet of skid marks. On the trial of the case Miss Edmonds testified that she did not see the sack of feed until after the plaintiffs’ Mustang had run over it. The trooper’s report states that Miss Ed-monds said she saw the feed fall off the truck. Miss Edmonds did not remember making the statement that the trooper reported, and did not remember seeing the sack of feed fall from the truck. She and her passenger both observed the Mustang brake lights go on; Miss Edmonds immediately began to bring her automobile to a stop. We find no evidence of negligence on her part. The record does not support a conclusion that she was exceeding the speed limit, nor that she was following too close to the plaintiffs’ Mustang, in viola *600 tion of R.S. 32:81, subd. A. There was no reason for Miss Edmonds to anticipate that the plaintiffs' Mustang would be brought to a sudden stop in the highway until the sack of feed fell from Vaughan’s truck. Upon that occurrence, things began to happen rapidly: the Mustang ran over the feed sack before the feed sack stopped moving in the highway; both passenger vehicles skidded over 100 feet; the Ed-monds car hit the rear of the plaintiffs’ Mustang before the Mustang came to a halt.
Nor does the record support the contentions of the plaintiffs that the awards for Mrs. Mason’s and Mrs. O’Neal’s personal injuries are grossly inadequate. Both women had many complaints. There was no medical testimony to connect some of the complaints to the automobile accident. The physicians found that the two women suffered from whiplash-type injuries. The testimony surrounding the injuries is voluminous, but does not justify a finding that the trial judge abused his discretion in fixing the awards.
Mrs. O’Neal, twenty-five years old, was hospitalized for about thirteen days in Springhill. She returned to work by February 13. However, she continued to experience some low back pains, headaches and neck pains for the next five or six months. She had made a claim for diplo-pia, but this claim was abandoned on the trial. Mrs. O’Neal was treated by Dr. Gray and examined by Dr. Rambach, Dr. Boykin and Dr. Young. Her complaints were attributed by the physicians to cervical muscle strain and myofascial strain in the cervical and lumbar area.
Mrs. Mason was twenty-seven years old. She reported to the hospital after the accident, but did not see a doctor. On January 5 she was examined by Dr. Gray, and attempted to work on her regular shift. She began to experience pain and returned to the hospital in Springhill where she remained until January 17. Mrs. Mason was then referred to Dr. Rambach and Dr. Boykin for examination. Dr. Rambach found no neurological abnormality but some discomfort due to strain in the cervical spine. Dr. Boykin’s neurological examination found Mrs. Mason to be within normal limits and found no diplopia. He found her neck and low back pain to be secondary to muscle and ligament sprain and recommended that she be treated symptomatically and without traction. Dr. Custer concluded his examination as a result of the complaint of double vision as follows: “I do not think she will be inconvenienced or incapacitated from diplopia.” Dr. Young on February 28, 1967, was of the opinion that Mrs. Mason could continue to work “if she so desires.”
The record does not support a contention that the trial judge abused his discretion in fixing the amounts to be awarded for Mrs. Mason’s and Mrs. O’Neil’s personal injuries. To the contrary, the medical evidence in this record, interpreted in the light most favorable to the plaintiffs, is convincing that the awards fixed by the trial judge are entirely adequate.
The judgment of the district court is affirmed, at the cost of appellants.